SHAW, Judge,
dissenting.
• The majority opinion correctly observes that the medical testimony relative to causality comes from Dr. Kesden and Dr. Goodman. When questioned relative to this issue, Dr. Kesden testified as follows:
A Undoubtedly he had preexisting lung disease before his exposure to chlorine. However, he apparently was exposed to it considerably more than the usual concentration of chlorine by history, and chlorine Can cause chronic lung disease, although it does more frequently cause acute respiratory symptoms.
Prolonged exposure to it can lead to chronic respiratory insufficiency. The degree to which he has — this has exacerbated his underlying lung disease is very difficult to say.
I’m sure it didn’t help it, but I can’t give you an exact idea of how much it would have aggravated it.
Dr. Goodman was equally vague on the issue:
Q (By Mr. Hughes). . . . And what I’m going to ask you is, if you’re able to, using the 50 percent as the overall condition, what percentage or what amount of that 50 percent would you attribute to the chlorine gas incident and the welding torch incident, if any? And this would be based on reasonable medical probability, if you’re able to relate any of it, within reasonable medical probability?
A (By Dr. Goodman) All right. In view of the relative time involved, in other words, that he indeed began to have these complaints around the time of the incidents — and he certainly did have, I think, clearly with the chlorine incident — we did have, at least a temporary problem of the cough, I think that that’s clear, to me. I think the plumbing thing is somewhat less clear to me, both because I am not sure that this material is actually toxic to the lung and because I’m not quite sure of whether we’re talk *349 ing about an incident or what happened or whether there was something unusual about the soldering. I would say that 90 percent of this must be ascribed to his prior problems. Not less than 90 percent. And I do not believe that I can ascribe more than 10 percent to the precipitating and aggravating factors that we’ve described here. That is, 90 percent of the 50 percent and 10 percent of the 50 percent.
Q Now—
A I think you recognize that this type of calculation has its particular problems in medicine and this is a judgment that would be open to some difference of argument by other physicians or other people. I think you recognize that.
Q Now, with regard to his overall condition — and I’m not going to break it down any further — but can you, within reasonable medical probability, relate these incidents to the condition or do you — are you speculating on the causal relationship or are you stating that it is in your opinion related?
A I think that it might be possible to attribute a small amount of the aggravation of this to these illnesses, and that indeed is partially speculation, also, because as I say, the chlorine itself appeared to have been a minor episode, appeared to create a cough which lasted only until January. Whether this has permanent damage, there is little evidence that chlorine itself has permanent damage.
The — again, the soldering incident, I’m not sure that this material has any effects on the lung. Granted only that he began to have trouble about that time, or at least began to be aware of trouble about that time.
Based upon the equivocal nature of the testimony, the deputy commissioner determined:
“The medical evidence does not establish a causal relationship within a reasonable degree of medical probability between an incident on the job and the claimant’s emphysema. Dr. Kesden and Dr. Goodman establish only a medical possibility of a causal relationship. I must therefore find the claimant has failed to overcome his burden of proof and deny the claim.”
Taking into consideration the ambiguous nature of the medical evidence I am reluctant to reverse the trier of fact. In my opinion, the deputy’s finding is based upon competent substantial evidence and should be affirmed.